UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


DELINOIR FANETTE, et al.,

       Plaintiffs,

v.                                                  CASE NO. 1:10cv136-MW/GRJ

STEVEN DAVIS FARMS, LLC and
STEVEN M. DAVIS,

       Defendants.
_____/


ORDER GRANTING DOMESTIC FARMWORKER
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter came before this Court on the motion of the 29 domestic farmworker

Plaintiffs for partial summary judgment.  ECF No. 131.[1]   Plaintiffs seek summary judgment

regarding five claims brought under the Migrant and Seasonal Agricultural Worker Protection

Act, 29 U.S.C. § 1801, et seq. ("AWPA").   In particular, the domestic farmworker Plaintiffs

claim they are entitled to summary judgment with respect to the Defendants' violations of the

Act's provisions relating to disclosure 29 U.S.C. § 1821(a), recordkeeping 29 U.S.C. §

1821(d)(1), wage statements 29 U.S.C. § 1821(d)(2), housing certification 29 U.S.C. §

_____

[1]As used herein, the term "domestic farmworkers" refers to those Plaintiffs who were not
employed pursuant to temporary visas issued under the Immigration and Nationality Act, 8
U.S.C. § 1101(a)(15)(H)(ii)(A).  The group is comprised of Plaintiffs Yves Augustin, Francillon
Badio, Marie Marthe Beneche, Juslaine Cherelus, Dalestin Cherenfant, Sifort Contreker, Pierre
Anes Darvilmar, Marie I. Desruisseau, St. Gelus Dufresne, Marie Yolene Exume, Delinoir
Fanette, Marie Almonor Faustin, Devilma Florvil, Andre Jean-Baptiste, Zillianne Joly, Merancia
oseph, Rosie Joseph Anite Labrousse, Clervis Louis, Edel Joseph Mayard, Andrelise Mezilus,
Decion Nelson, Addly Petitfrere, Inocio Andre Simeon, Pierre Stimable, Iclercia St. Juste,
Mimose Vincent, Epfanie Saintelus Vital and Dukens Zephir.

1823(b)(1) and wage payment 29 U.S.C. § 1822(a).[2]

The domestic farmworkers' motion was supported by a statement of material facts not in dispute, filed in accordance with Local Rule 56.1(A). ECF No. 131-1.  Defendants Steven  M. Davis and Steven Davis Farms, LLC filed a brief in opposition to the domestic farmworkers' motion, ECF No. 153, but did not file a separate statement of the material facts with respect to which they claimed there was a genuine dispute requiring a trial.[3]

As set out below, Defendants readily acknowledge they did not comply with the AWPA's disclosure, recordkeeping, wage statement, housing and wage payment provisions, but contend they are not liable for these violations of the Act because they did not "employ" the domestic farmworker Plaintiffs within the meaning of the AWPA.

## Factual Summary

Defendant Steven Davis operates a farm in Alachua County and has over the years grown a number of crops, including cabbage, collards, mustard greens, turnip greens, green beans, squash, zucchini, peas, cantaloupe and watermelons.  At least a portion of the produce grown on Davis' farm is sold interstate.

In early 2008, Davis purchased a packing shed in Lacrosse, Alachua County, which he

---

[2]The domestic farmworker Plaintiffs also presented claims under several other provisions of the AWPA and sought unpaid minimum wages under the Fair Labor Standards Act, 29 U.S.C. § 206(a).  At the June 20, 2013, hearing in this matter, counsel for the domestic farmworkers advised this Court that if summary judgment was granted with regard to the five AWPA provisions, these Plaintiffs intended to voluntarily dismiss their remaining claims.

[3]Because Defendants failed to file the separate statement required by local rule, all material facts set out in the domestic workers' statement, ECF No. 131-1, are deemed admitted. Local Rule 56.1(A).  Furthermore, this Court finds the record discloses no genuine issues of material fact in dispute regarding the claims of the domestic farmworker Plaintiffs under the disclosure, recordkeeping, wage statement, housing certification and wage payment provisions of the AWPA.

used to grade and pack the crops grown on his farm.   At that time, Steven Davis Farms, LLC was created to operate the packing shed, with Davis as the principal owner and chief executive officer.  Even though it was intended that the farm, with Davis as sole proprietor, and the packing shed, operated by Steven Davis Farms, LLC, would operate separately, the financial accounts of the two are substantially intertwined.   Among other things, the operating expenses for the farm, including the costs of harvesting the crops, are paid by Steven Davis Farms, LLC.

The principal crops hand-harvested on Davis' operations are peas and green beans.  In recent years, most of the hand-harvest work has involved peas. Substantial numbers of workers are needed to harvest the green bean and pea crops, beginning in May and June.   Because Davis is unable to locate sufficient local labor, he relies on migrant labor to pick the green beans and peas produced on his farm.  Prior to 2007, Davis relied on farm labor contractor Eugene Regis to recruit and furnish harvest labor to pick Davis' green beans and peas.  Beginning in 2007, responsibility for recruiting hand-harvest labor for Davis' farm was assumed by Cabioch Bontemps, Regis' stepson.   Bontemps was not registered with federal or state authorities as a farm labor contractor.

Bontemps recruited most of the harvest workers from the Miami area.  Many of the Miami-based workers returned to work at the Davis farm year after year.   The domestic worker Plaintiffs were among the Miami-based workers Bontemps recruited and furnished to the Davis farm for work in the following harvest seasons between 2007 and 2010.  A detailed breakdown of the domestic farmworker Plaintiffs and the harvest seasons worked by each is attached as an addendum to this order.[4]

---

[4] Defendants assert that certain of the domestic farmworker Plaintiffs did not work at

Neither the domestic worker Plaintiffs nor any of the other members of Bontemps' crew were provided with a written statement of the job terms at the time of their recruitment.

Since at least 2008, Cabioch Bontemps has worked exclusively for Steven Davis on a year-round basis.  Bontemps considers himself a manager for Davis.  Besides recruiting harvest labor, Bontemps has worked for Davis as a salesman, forklift operator and security guard. Bontemps has assisted Davis in running his agricultural business, spraying the crops with chemicals and pesticides, delivering the produce to buyers and markets in central and north Florida and purchasing parts for Davis' farm equipment.  In recent years, Bontemps' principal job has been assisting Davis in selling his produce.  For a time, Bontemps resided at Davis' packing shed, with Davis paying the utility bills for Bontemps' quarters.

Bontemps was paid for his work by both Davis individually and by Steven Davis Farms, LLC.  For his work furnishing harvest labor, Bontemps was paid based on the volume of produce his crew harvested.  For furnishing workers to Davis' packing shed, Bontemps was paid $8.00 per hour.   In addition, Bontemps was paid $500 per week for his other duties, such as helping load trucks, delivering produce to Davis' customers and assisting with sales of the crop.   For at least part of this period, Davis treated Bontemps as an employee for tax purposes, issuing Bontemps a W-2 form for his work furnishing and supervising workers.

---

Davis' farm during all of the seasons claimed. However, because Defendants failed to file a statement of material facts in dispute in accordance with Local Rule 56.1(A), *see supra* note 3, the Plaintiffs' work histories must be credited.  Had this Court been required to reach the issue of the domestic farmworkers' work histories, there appear to be genuine and material factual disputes regarding the work claimed to be performed on the Davis Farm by Plaintiffs Yves Augustin, Marie I. Desruisseau (dispute with respect to the 2008 and 2009 harvests), St. Gelus Dufresne (2007), Delinoir Fanette (2009 harvest), Andre Jean-Baptiste (2009 harvest), Zillianne Joly (2008 harvest), Merancia Joseph (2007), Anite Labrousse (2007 and 2009 harvests) and Dukens Zephyr.

Davis made decisions regarding the planting, fertilizing and cultivation of his crops without any input from Bontemps.  Davis provided all the capital for his farming operations and owned the equipment used to plant and cultivate the crops.

Harvesting is a crucial and integral step in Davis' farming business.  On a daily basis, Davis selected the particular fields to be harvested, and then instructed Bontemps of the location for the day's picking and the type and volume of vegetables to be harvested.

The harvest workers placed the peas or beans into sacks provided by Davis. Workers designated as "luggers" carried the filled sacks, weighed the contents and issued a token to the worker for each sack filled. Davis provided portable toilets, drinking water and hand washing facilities for use by harvest workers in Bontemps' crew.

One of the luggers for Bontemps' crew was Addly Pierre, also known by his nickname, "Michael."  Pierre was a year-round employee of Davis, and was paid wages directly by Steven Davis Farms, including for work as a lugger with Bontemps' crew.  Pierre also supervised the work of the harvesting crew when Bontemps was away from the field delivering produce to buyers for Davis or loading pallets with a forklift in Davis' packing shed.

During the time green beans or peas were harvested, Davis visited three to five times per day.  During these visits, Davis inspected the work being done by the individual pickers and if he discovered a worker picking beans of the wrong size or quality, Davis informed Bontemps so that Bontemps could speak directly to the picker. On occasion, Davis directly demonstrated to the workers which beans to pick and which not to pick, and sometimes picked alongside the members of Bontemps' crew, in part to boost the morale of the harvest workers.

Davis retained the authority to reassign members of Bontemps' harvesting crew to other jobs on the farm as needed.   Among other things, Davis had the power to direct Bontemps to send part of his harvesting crew to the packing shed to grade vegetables.  At the packing shed, members of Bontemps' crew worked grading green beans or butterbeans, and removing and discarding the spoiled or misshapen beans.  When grading beans in Davis' packing shed, the Plaintiffs and the other members of Bontemps' crew performed the same job and worked alongside local residents who were paid directly by Davis or Steven Davis Farms.  In the packing shed, Davis monitored the work of Bontemps' crewmembers and supplied time cards used to record hours of work.

Davis paid Bontemps for his labor contracting work in a lump sum.  From this lump sum, Bontemps was expected to pay the members of his crew their wages, as well as any related employment taxes.   No Social Security (FICA) or unemployment compensation taxes were paid on the earnings of workers in Bontemps' crew.

Bontemps was responsible for maintaining payroll records on the members of his crew, and he relied on Davis' employee, Addly Pierre, to handle most of the recordkeeping.

None of the payroll records for Cabioch Bontemps' crew from 2007 through 2010 are still in existence.  Bontemps himself did not retain a copy of his records.  Davis does not have the payroll records, in part, because Bontemps never provided him with a copy.

Payroll records prepared by Bontemps and Addly Pierre were admittedly deficient. Among other things, there was no record of the number of hours worked by the members of the crew while picking green beans or peas on a piece-rate basis.  In addition, the records occasionally listed the production of two workers under a single worker's name.

- 6 -

The domestic farmworker Plaintiffs and the other members of Bontemps' crew were paid wages in cash, with the money enclosed in an envelope, usually prepared by Addly Pierre, a full-time employee of Davis. The pay envelopes listed only the workers' total earnings, and did not show the number of piece-work units earned.   When workers picked together, a single pay envelope was used, rather than providing an envelope to each member of the picking team.  The envelopes did not list the employer's name and address or the date of payment, and did not show the number of hours worked on piece-rate tasks.

Davis rented trailers from his father to accommodate the members of Bontemps' crew. The members of Bontemps' crew were charged $10 per week for the accommodations with the charge withheld from their weekly earnings.  The facilities were not permitted nor approved for occupancy by migrant agricultural workers, nor had they been inspected by the local health department or any other governmental agency.   Davis paid for repairs to the housing facilities.

## **Summary Judgment**

A party may be granted summary judgment when "there is no genuine issue as to any material fact... and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment "should be rendered if the pleadings, the discovery, disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c)(2); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 417 U.S. at 323 (citations omitted).  If

the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the moving party is not entitled to judgment as a matter of law.  *Id.* at 324-36.  This evidence must consist of more than mere conclusory allegations.  *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

## AWPA AND FLSA COVERAGE OF STEVEN DAVIS FARMS, LLC

### Employer status of the Defendants

The central disputed issue in this case is whether Davis "employed" the farmworkers recruited and furnished by Bontemps within the meaning of the AWPA).   The domestic farmworker Plaintiffs contend that Cabioch Bontemps was the full-time and admitted employee of Davis. They and the other members of Bontemps crew were, therefore, also Davis' employees.  Alternatively, the domestic farmworkers argue that even if Bontemps operated as an independent contractor in his dealings with the migrant crew, Davis nonetheless was a joint employer of the crewmembers and thereby responsible for the violations of the AWPA.

### Defenses presented after the close of discovery

After the close of discovery and following the submission by the domestic farmworker Plaintiffs of their motion for summary judgment, Defendants sought to assert as an affirmative defense the so-called  "small business" exemption to the AWPA, 29 U.S.C. § 1803(2). 29 C.F.R. § 500.30(b).  Under this provision, growers are excused from the AWPA's requirements if they fall within the "man days" exemption available to small farms under the Fair Labor Standards Act.  29 U.S.C. § 1803(a)(2).[5]   The FLSA "man days" exemption applies to agricultural

---

[5]Under the FLSA, a man day is any day in which an employee performs an hour or more of agricultural labor.  29 U.S.C. § 203(u); 29 C.F.R. § 780.305(a).

employers who did not use more than 500 man days of agricultural labor in any calendar quarter in preceding year. 29 U.S.C. § 213(a)(6)(A). *See also* 29 C.F.R. § 500.30(b) (incorporating the FLSA "man days" exemption into the AWPA).[6]

Defendants' argument fails for several reasons. First, under Federal Rule of Civil Procedure 8(c), a claim of exemption is an affirmative defense that must be specifically pleaded or it will be deemed waived. *See, .e.g., Morrison v. Exec. Aircraft Refinishing, Inc.*, 434 F. Supp. 2d 1314, 1318-19 (S.D. Fla. 2005).[7] Because Defendants failed to specifically plead this exemption in their answer, ECF No. 57, Defendants have waived the affirmative defense. While this Court may, in its discretion, allow a late amendment to raise an affirmative defense, it will not do so here. It would be prejudicial to Plaintiffs to permit an amendment after discovery has closed. To allow such eleventh-hour amendments without a compelling showing of cause would encourage great mischief by parties seeking to try cases by ambush contrary to the letter and spirit of the discovery rules.

Second, even if Defendants were allowed to raise the small business exemption at this late date, Defendants have failed to establish their entitlement to its benefits. Because this exemption is an affirmative defense, Defendants have the burden of establishing the exemption at trial, *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974), and also on summary judgment. *See Roca v. Alphatech Aviation Servs.,* Inc., No. 1:12-cv-23955, 2013 WL 4436558,

---

[6]Because the AWPA adopts by reference the FLSA's man day exemption in 29 U.S.C. § 1803(a)(2), the jurisprudence relating to FLSA exemptions applies equally in the application of the AWPA's small business exemption.

[7]This Court rejects Defendants' contention that the small business exemption in 29 U.S.C. § 1803(a)(2) is jurisdictional. It is an affirmative defense that must be pleaded and proven by an agricultural employer or farm labor contractor.

at *4 (S.D. Fla. Aug. 20, 2013); *Klem v. Cnty. of Santa Clara*, 208 F.3d 1085, 1095 (9th Cir. 2000) (finding in summary judgment motion, "the burden is on the [employer] to demonstrate its entitlement to an exemption from the overtime provisions of the FLSA.").

In this case, the Defendants face a heightened burden of proof because of the remedial nature of the AWPA. It is not enough for Defendants to show they are exempt from the AWPA by a preponderance of the evidence; instead, it must demonstrate that it is plainly and unmistakably within the terms and spirit of the exemption.

The Eleventh Circuit has emphasized that the "AWPA is a remedial statute and should be construed broadly to affect its humanitarian purpose." *See Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1505 (11th Cir. 1993). As a corollary, exemptions are disfavored, not given generous application, and are construed narrowly against employers asserting them. *Auer v. Robbins*, 519 U.S. 452, 462 (1997)*; Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) ("We have held that these exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.").

The Defendants have offered no evidence whatsoever regarding the man-days used during the relevant years. This is not surprising given the haphazard nature of the Defendants' recordkeeping practices. Only fragmentary records were kept regarding the number of individuals furnished to the Defendants by Cabioch Bontemps.

The Defendants suggest that, at a minimum, Defendant Steven Davis Farms, LLC is exempt from the Act during 2008, its initial year of operation. Ordinarily, a new entity would automatically be able to claim the small business exemption, because the fledgling employer had no employees whatsoever in the prior calendar year. However, this is only true if the new entity

- 10 -

is indeed an independent entity, rather than simply a continuation of a pre-existing employer. *See, e.g., IUAIW v. Ruiz*, No. B-83-270, 1991 WL 315133, at *5 (S.D. Tex. Jan. 22, 1991) (newly-incorporated company denied small business exemption under the AWPA because it was simply a restructured and continuing version of an earlier entity).

Here, Steven Davis Farms, LLC never operated as a business independent of Steven Davis in his individual capacity.  As Davis' bookkeeper noted, there was regular co-mingling of the assets of the LLC and individual accounts.   The fact that Davis viewed his individual farming operations and the packing shed corporation as interchangeable was reflected in a June, 2010, letter written to verify the employment of Plaintiff Devilma Florvil.  In the letter, Davis' office manager wrote that Florvil had worked for the prior eight years "doing field work" and that for "the last 2 years" had been employed by Steven Davis Farms, LLC.

### Employer status of the Defendants

The central disputed issue in this case is whether Davis "employed" the farmworkers recruited and furnished by Bontemps within the meaning of the AWPA.   The domestic farmworker Plaintiffs contend that Cabioch Bontemps was a full-time and admitted employee of Davis, they and the other members of the Bontemps crew were therefore also Davis' employees. Alternatively, the domestic farmworkers argue that even if Bontemps operated as an independent contractor in his dealings with the migrant crew, Davis nonetheless was a joint employer of the crew members and thereby responsible for the violations of the AWPA.

The AWPA was passed in 1982 to provide minimum protections for migrant and seasonal agricultural workers, including provisions demanding accurate recordkeeping and timely and complete wage payments.   *See, e.g.*, 29 U.S.C. §§ 1821-1823,1831-32.  In order "to assure necessary protections for migrant and seasonal agricultural workers,"  29 U.S.C. § 1801,

the statute imposes obligations on "agricultural employers," including farm and packing shed operators which "employ" migrant or seasonal farmworkers. 29 U.S.C. § 1802(2) and 29 C.F.R. § 500.20(d). The AWPA expressly defines "employ" as synonymous with the term's use in the Fair Labor Standards Act. 29 U.S.C. § 1802(2)(5). Thus, an entity that employs agricultural workers under the FLSA necessarily employs the workers for the purposes of the AWPA and vice versa. *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996).

The Eleventh Circuit has issued several decisions determining whether farmers "employed" the harvest workers furnished to them by farm labor contractors for purposes of the AWPA and the FLSA. Two of the more recent such rulings involved Haitian bean-picking crews, and in both instances the appeals court concluded that the farmer jointly employed the bean pickers along with the farm labor contractors. *Antenor*; *Charles v. Burton*, 169 F.3d 1322 (11th Cir. 1999). This Court's analysis is guided by the principles set out in these decisions.[8]

Under the FLSA and the AWPA, an entity "employs" an individual if it "suffers or permits" the individual to work. *Id.*; 29 U.S.C. § 203(g); 29 U.S.C. § 1802(5). This broad definition of employment is critical to furthering the remedial purposes of the AWPA and the FLSA. *Antenor*, 88 F.3d at 933.

In defining employment under the AWPA and the FLSA, Congress expressly rejected the common-law definition of employment, which is based on limiting concepts of control and supervision. *Id.* at 929, 933. Under the narrower common-law principles of master and

---

[8]The Eleventh Circuit recently revisited the joint employment issue in *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172 (11th Cir. 2012). Although it viewed the joint employment formulation set out in *Charles* as only persuasive, rather than precedential, for purposes of reviewing non-agricultural FLSA claims, the appeals court expressly declined to alter the *Charles* analytical framework for evaluating AWPA claims.

servant, the focus is on the hiring party's right to control the manner and means by which the

work is done.  *Nationwide Mut. Ins. Co., v. Darden*, 503 U.S. 318, 323 (1992).  In contrast, under

the broader FLSA definition, an entity "suffers or permits" an individual to work if, as a matter of

economic reality, the worker is dependent on the entity.  *Martinez-Mendoza v. Champion Int'l

Corp.*, 340 F.3d 1200, 1208 (11th Cir. 2003).  This is a definition of "striking breadth."

*Nationwide Mutual Ins. Co.*, 503 U.S. at 326; *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1495

(11th Cir. 1993) (describing the definition as "sweeping").  It has been called "the broadest

definition [of employee] that has ever been included in one act."  *Antenor v. D & S Farms*, 88

F.3d 925, 929 n.5 (11th Cir. 1996) (quoting *U.S. v. Rossenwasser*, 323 U.S. 360, 363 n.3 (1945)).

Because the AWPA and the FLSA are remedial statutes, the definition of "employ" should be

construed broadly to effect Congress' statutory effect.  *Antenor*, 88 F.3d at 933; *Caro-Galvan*,

993 F.2d at 1505 ("AWPA is a remedial statute and should be construed broadly to effect its

humanitarian purpose.").

　　　　Under the AWPA, growers who engage the services of farm labor contractors to furnish

farmworkers are found to have "employed" the members of the labor contractors' crews in two

contexts: (1) when the farm labor contractor utilized is, as a matter of economic reality, an

employee of the grower rather than an independent contractor; or (2) when the independent farm

labor contractor is "not completely disassociated with respect to the employment" of workers,

such that the labor contractor and the grower are deemed to jointly employ the workers.  *See* 29

C.F.R. § 500.20(h)(4)-(5); 29 C.F.R. § 791.2(a).   Thus, if Davis employed farm labor contractor

Bontemps, he also perforce employed the domestic worker Plaintiffs and the other members of

Bontemps' crew.  *See* 29 C.F.R. § 500.20(h)(4) ("If it is determined that the farm labor

- 13 -

contractor is an *employee* of the agricultural employer/association, the agricultural workers in the farm labor contractor's crew who perform work for the agricultural employer/association are deemed to be employees of the agricultural employer/association and an inquiry into joint employment is not necessary or appropriate."); *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 (5th Cir. 1985) ("If the alleged contractor were held to be an employee of the farmer, it would necessarily follow that the workers were in turn the farmer's employees."); *Castillo v. Givens*, 704 F.2d 181, 188 (5th Cir. 1983) ("If [the contractor] was an employee of defendant, the plaintiff field workers were also defendant's employees."); *Arredondo v. Delano Farms Co.,* No. 1:09-cv-01247, 2012 WL 1232294 at *9 (E.D. Cal. Apr. 12, 2012) ("If it is determined that the farm labor contractor is an employee of the agricultural employer, the agricultural workers are deemed to be employees of the agricultural employer and the inquiry ends."); *Monville v. Williams*, No. JH-84-1648, 1987 WL 42404 at *5 (D. Md. Oct. 8, 1987) ("If the farm labor contractor who recruited the agricultural workers in question is an employee of the farmer, it follows that the farm workers are also the farmer's employees.")

In determining whether Bontemps was an employee of Davis,' as opposed to an independent contractor, the ultimate issue is whether Bontemps economically depended on Davis. The Court must determine, *inter alia*, if Bontemps' labor contracting business was sufficiently large so that Bontemps was genuinely "in business for himself." *Beliz*, 765 F.2d at 1327-28. In this case, the unrebutted evidence reflects that Bontemps operated more as Davis' foreman than as an independent farm labor contractor. Bontemps had no separate business and instead worked exclusively for Davis. By his own admission, Bontemps worked as a manager for Davis, performing a wide range of jobs, of which recruiting harvest labor was but one. Davis

directly paid Bontemps for his work, with all of his tasks other than recruiting labor paid through a weekly salary.  Davis issued a W-2 form to Bontemps as an employee of his farm.  Bontemps lived rent-free in a room at Davis' packing shed.

Bontemps' dependence on Davis is obvious when their relationship is analyzed under the relevant factors identified in the United States Department of Labor's AWPA regulations, 29 C.F.R. § 500.20(h)(4):[9]

●**The nature and degree of the putative employer's control as to the manner in which the work is performed.**   Davis controlled every facet of the work of Bontemps' bean-picking crew.[10]  He set the overall harvest schedule and decided which fields would be harvested each day.  Davis reserved and exercised his right to remove members from Bontemps' harvesting crew and assign them on a daily basis to other jobs on the farm on an as needed basis. It was Davis who decided when Bontemps' crew would be transferred *en masse* to work in the packing shed, even though Bontemps' compensation rate as a farm labor contractor was considerably lower for packing shed work than it was for providing harvest labor.  Davis visited the fields three to five times daily during harvesting, often spending as much or more time in the

---

[9]The Department of Labor's interpretation of the statutory language of "employ" in AWPA at 29 C.F.R. § 500.20(h)(4) and (5) is entitled to significant weight, particularly because it was incorporated into a formal rulemaking.  *Charles v. Burton*, 169 F.3d 1322, 1328, n.10 (11th Cir. 1999).

[10]Among the factors indicating significant grower control over a labor contractor are (1) grower's control of overall harvest schedule; (2) control over the number of workers used for harvest; (3) grower's advice to contractor as to when to begin the harvest; (4) grower's power to determine the days for harvest; (5) grower's right to inspect the work of the contractor's crew members; and (6) presence of grower at jobsite on a daily basis.  *Arredondo*, 2012 WL 1232294 at *10 (citing *Torres-Lopez v. May*, 111 F.3d 633, 642 (9th Cir. 1997)); *Castillo v. Givens,* 704 F.2d at 189, n.17 (describing grower control through non-supervisory activities *vis a vis* the field workers).

fields than Bontemps himself.  When Bontemps was not in the fields, direct supervision of the harvest workers was provided by one of Davis' employees, Addly Pierre.

●**The putative employee's opportunity for profit or loss based on his/her managerial skill.**  Davis sharply circumscribed Bontemps' managerial options.  Davis alone decided that harvesting work would be paid on a piece-rate basis, with packing shed work paid by the hour.  Besides determining the wage rates, Davis decided when and where the members of Bontemps' crew would work.  While Bontemps could realize a profit from his labor contracting activities, his compensation was based entirely on the volume of produce harvested by his crew, which was largely determined by decisions made unilaterally by Davis, rather than on any entrepreneurial skills Bontemps possessed.  *Beliz*, 765 F.2d at 1328 (contractor was an employee, in part because his profit was determined by the grower's decisions as to the days worked and the amount of produce to be harvested).  Because Bontemps provided no risk capital, his opportunity for loss was negligible.  *Luna v. Del Monte Fresh Produce*, No. 1:06-cv-2000, 2008 WL 754452 at *8 (N.D. Ga. Mar. 19, 2008) (contractor found to be employee in part because "[g]iven the limited nature of her investment, [the contractor's] opportunity for loss was practically nonexistent.").

●**The putative employee's investment in equipment.**   The only equipment Bontemps contributed to the harvest operation was a van he used to transport some of the members of his crew to the jobsite.  However, even this van was often driven by Davis' employee, Addly Pierre, and Davis himself drove some of Bontemps' crewmembers to the fields in his own pickup.   By contrast, Davis provided all the capital for seed, fertilizer and chemicals to produce the crops, as well as the equipment used for planting and cultivation.   Davis also supplied all of the materials and equipment used by the members of Bontemps' crew in the harvest operations, including the picking sacks and the portable toilets, hand washing facilities and drinking water at the jobsite.

- 16 -

Davis also provided housing for the members of Bontemps' crew at a nominal charge.

●**Whether the skills rendered by the putative employee require special skill.**   Other than being bilingual in English and Haitian Creole, Bontemps brought no specialized skill set to the job.  *Monville,* 1987 WL 42404 at *5 (contractor had no special skills that the farmer did not possess other than his ability to speak the language of the Haitian vegetable pickers, the farmer made all critical decisions regarding planting, fertilizing and irrigation and the contractor provided no risk capital).    Bontemps was unable to even maintain the payroll records on his crew, and relied on one of Davis' employees, Addly Pierre, to both prepare the payroll and to issue wage statements to the pickers.    Neither did Bontemps' oversight of the harvest suggest any specialized skills.  Bontemps' had no special skills in overseeing the harvest; Facts 34 and 35.  *Beliz*, 765 F.2d at 1328 (contractor offered no special skills when he simply provided "routine supervision of the kind commonly given by foremen").  Indeed, much of the harvesting supervision was provided by one of Davis' employees, Addly Pierre.

●**The degree of permanency and duration of the working relationship.**   Bontemps has been employed on Davis' farm for over a decade and has worked exclusively for Davis since 2008.  He lived rent-free at Davis' packing shed.  *Arredondo*, 2012 WL 1232294 at *13 (permanency exists where contractor worked for farm for over 19 years and farm provided rent-free a complex to contractor for his use).  Bontemps works year-round as a manager for Davis, performing a wide range of jobs, most of which do not involve labor contracting.

●**The extent to which the services rendered by the putative employee are an integral part of the putative employer's business.**   A worker who performs a routine task that is a normal and integral part of the grower's production is likely to be dependent on the grower's overall production.  *Antenor*, 88 F.3d at 937 (harvesting is integral to bean growers' business);

*see also Charles,* 169 F.3d at 1332-33.    Davis acknowledges that the harvesting work of Bontemps' crew is a crucial and integral part of Davis' farming business.

Having reviewed these facts, it is clear that Bontemps was Davis' employee during the harvest seasons at issue.  Accordingly, the members of his crew, including the domestic farmworker Plaintiffs, were also employees of Davis.

However, even if Bontemps was an independent contractor rather than an employee, this Court finds that Davis was their joint employer and thereby responsible for compliance with the AWPA's requirements.   Under the AWPA, a worker can be jointly employed by more than one entity at the same time.  H.R. Rep. 97-885, 97th Cong. 2d Sess. (1982), *reprinted in* 1982 U.S. Code Cong. & Adm. News 4547, 4552 (the inclusion of the "suffer or permit" definition in the AWPA "was deliberate and done with the clear intent of adopting the 'joint employer' doctrine as a central foundation of this new statute."); *Charles* 169 F.3d at 1327-29 (holding that growers and farm labor contractor jointly employed crew of bean pickers); *see also Antenor*, 88. F.3d at 929-30.

Congress deliberately included the joint employment concept in the AWPA because of the widespread use of labor contractors in agriculture.  The House Committee that drafted the AWPA stressed that the adoption of the FLSA definition of "employ" was "done with the clear intent of adopting the 'joint employer' doctrine as a central foundation of this new statute" and "the indivisible hinge between certain important duties imposed for the protection of migrant and seasonal workers and those liable for any breach of those duties."   H.R. Rep. 97-885, 97th Cong. 2d Sess., at 6, *reprinted at* 1982 U.S. Code Cong. & Adm. News 4552;   The joint employer concept was deemed "the best means by which to insure that the purposes of this Act would be fulfilled.  H.R. Rep. 97-885, 97th Cong. 2d Sess., at 7, *reprinted at* 1982 U.S. Code Cong. &

Adm. News 4553.

The "suffer or permit" definition of employment included in the FLSA was borrowed from early state child labor laws specifically designed to reach businesses that used middlemen to illegally hire and supervise children. *Antenor*, 88 F.3d at 929 n.5 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 n.7 (1947)).   Many of the young children who were the intended beneficiaries of early child labor laws were employed by undercapitalized and economically marginal entities that were independent contractors at common law.  Bruce Goldstein, et al., *Enforcing Fair Labor Standards in the Modern American Sweatshop: Rediscovering the Statutory Definition of Employment*, 46 UCLA L. Rev. 983, 1028-39 (1999). The "suffer or permit" formulation was developed to overcome the limiting common law principles of master and servant by holding accountable those businesses found to have the power to prevent the unlawful employment of children, even when intermediaries were used to hire and supervise their work. *Id*. at 1039-47.   In a case cited favorably in  *Antenor*, 88 F.3d at 929 n.5,  Judge Cardozo stated with regard to New York's child labor law:

> The command is addressed to him.  Since the duty is his, he may not escape it by delegating it to others. He breaks the command of the statute if he employs the child himself.  He breaks it equally if the child is employed by agents to whom he has delegated 'his own power to prevent.' ... The personal duty rests on the employer to inquire into the conditions prevailing in his business.  He does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates ... The cases must be rare where prohibited work can be done within the plant, and knowledge or the consequences of knowledge avoided.

*New York ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 121 N.E. 474, 476 (N.Y. 1918) (company liable where its rules prohibited, but failed to prevent, milk truck drivers from hiring and paying minors to guard trucks during deliveries).

In applying the joint employment test, Congress emphasized that "it is the economic

reality, not contractual labels, nor isolated factors, which is to determine employment relationships under this Act."   H.R. Rep. 97-885, 97th Cong. 2d Sess., at 7, *reprinted at* 1982 U.S. Code Cong. & Adm. News 4553.   The ultimate inquiry is whether the worker is economically dependent on the putative employer for his livelihood.  *Aimable v. Long & Scott Farms, Inc*., 20 F.3d 434, 439 (11th Cir. 1994) ("To determine whether an employer/employee relationship exists...we look...to the "economic reality" of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer."); *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947) ("[I]n the application of social legislation employees are those who as a matter of economic reality are dependent on the business to which they render service.").   The economic dependence test is simply a means of applying the "suffer or permit to work" standard.  If a worker is dependent on an entity, that entity plainly suffers the employee to work.

In much of crop agriculture, the harvest workers' livelihood is a function of two basic variables:  the amount of work available and the wage rates paid for that work.   The worker is dependent on any putative employer which has the power to determine either of these variables. Whether a grower has sufficient power to determine the amount of work offered or the wages paid is often gauged through the application of a number of factors which, properly applied, shed light on the nature of employment relationships.  *Antenor*, 88 F.3d at 932.  The Eleventh Circuit has detailed the proper use of these factors in evaluating putative joint employment relationships in agriculture.   In applying the factors, the inquiry is not whether the worker is more economically dependent on one entity than another, with the winner avoiding responsibility as an employer.  Instead, each employment relationship must be evaluated separately, to determine whether the putative employer has suffered or permitted the employee to work.   No one factor is

determinative and the absence of evidence as to any one factor does not preclude a finding of joint employment. Instead, the factors are to be used as tools to evaluate an employment relationship, with the weight given each factor based on the degree to which it sheds light on the workers' economic dependence on the putative employer. *Antenor*, 88 F.3d at 932-33.

Because of perceived misconceptions regarding joint employment relationships in agriculture, the United States Department of Labor in 1997 issued regulations under the AWPA to provide guidance in determining economic dependence, and ultimately, whether a joint employment relationship exists. 29 C.F.R. § 500.20(h)(5)(iv). The Eleventh Circuit has noted that the Department of Labor's 1997 AWPA regulations are entitled to significant weight. *Charles*, 169 F.3d at 1328, n.10; *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173-74 (2007) (holding Department of Labor interpretive regulations are entitled to controlling deference).

Davis controlled the amount of work available to the domestic workers Plaintiffs and the others in the Bontemps crew. He decided when and where the individual workers would be assigned, based on the needs of the farm. Davis also had the power to dictate the wage rates paid the domestic farmworkers. He set the determined that harvesting work would be paid on a piece-rate basis, creating an incentive for pickers to maximize their production and thereby lessening the need for supervisory oversight to prod the pickers to work hard. He likewise decided that the workers would receive an hourly rate for their packing shed work and set the rate for this work, a rate that was paid both to Davis' direct employees working in the packing shed as well as to the members of Bontemps' crew who worked alongside them.

Analysis under the Department of Labor's joint employment regulations further illuminates the relationship between Davis and the harvest workers:

- 21 -

●**Davis controlled the work of the domestic farmworkers.**  The initial joint employment factor identified by the Department of Labor's regulations examines whether the putative employer has the power, either alone or through a labor contractor, to direct, control or supervise the workers or the work performed, directly or indirectly.  29 C.F.R. § 500.20(h)(5)(iv)(A).  Davis controlled every important facet of the domestic farmworkers′ employment.  He decided which fields would be harvested each day and the amount of produce to be harvested.  *Charles*, 169 F.3d at 1330 (control indicated when the grower determines the fields in which the workers will pick and the date on which a field will be harvested).  He retained and occasionally exercised the right to remove members from Bontemps′ harvesting crew and assign them on a daily basis to other jobs on the farm on an as needed basis.  Davis decided when the entire Bontemps crew would be assigned to the packing shed for work. *Charles,* 169 F.3d at 1329 (control is indicated when the grower is able to assign work to specific workers).  Davis also demonstrated to the workers how to perform the job correctly and advised Bontemps when his onsite inspections revealed improper picking by specific crew members. The fact that he relied on Bontemps to communicate his concerns to the workers in their native Haitian Creole does not negate Davis' control over the harvesting work.  Joint employment relationships in agriculture often involve this sort of indirect supervision.  *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 238 (5th Cir. 1973) ("The fact that [the farmer] effected the supervision by speaking to the crew leader, who, in turn spoke to the harvest workers, rather than speaking directly to the workers does not negate a degree of apparent on-the-job control over the harvest workers."); *Torres-Lopez,* 111 F.3d at 642-43 (9th Cir. 1997).

●**Davis had the power to modify the employment conditions and to determine pay rate rates of the bean pickers.**   The second Department of Labor factor assesses whether the

putative employer has the right to hire or fire workers, modify the workers' employment conditions or determine the pay rates of method of payment. 29 C.F.R. § 500.20(h)(5)(iv)(B). Davis was able to modify the domestic workers' employment conditions through his unfettered power to place them wherever they were needed on the farm.   On a daily basis, Davis determined when the crew would harvest vegetables and the amount of produce to be picked. Facts 27 and 28.  *Charles,*169 F.3d at 1331 (growers' control over the timing of the harvest indicates the power to modify employment terms).   Davis also determined, at least indirectly, the pay rates for the workers by deciding that harvesting work would be compensated on a piece rate, rather than an hourly, basis.

●**The parties' relationship was relatively permanent and exclusive.**  The third Department of Labor factor evaluates the duration and degree of permanency of the parties' relationship, in the context of the agricultural activity at issue, which is often seasonal in nature. 29 C.F.R § 500.20(h)(5)(iv)(C).  Where a labor contractor and his crew are engaged for the duration of the operation and are obligated to work only for or be available to the putative employer at its discretion, this suggests economic dependence.  Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. 11,734, 11740 (Mar. 12, 1997).  Bontemps' crew worked exclusively for Davis; indeed, in order to reside in Davis' housing, the members of Bontemps' crew were expected to work for his farm.

●**Bean harvesting is unskilled, rote work.**   Another indicator of employment status is the extent to which the services rendered are repetitive or rote tasks requiring little skill. 29 C.F.R. § 500.20(h)(5)(iv)(D).  Unskilled jobs, particularly those performed on a piece-rate basis, require less direct supervision. *Antenor*, 88 F.3d at 935.   In an earlier case involving Haitian

migrant workers, the Eleventh Circuit held that is "unquestionable" that hand-picking snap beans "is a repetitive and rote task requiring relatively little training." *Charles*, 169 F.3d at 1332.

●**Harvesting is an integral part of Davis' overall business.**   The fifth Department of Labor factor inquires as to whether the activities performed are an integral part of the overall business of the agricultural employer, 29 C.F.R. § 500.20(h)(5)(iv)(E).   A worker who performs a routine task that is a normal and integral part of the grower's production is likely to be dependent on the grower's overall production.  *Antenor,* 88 F.3d at 937; *Charles,* 169 F.3d at 1332-33.   Harvesting the crop is an integral part of a bean grower's business, and Davis acknowledged as much.  *Antenor*, 88 F.3d at 937; *Charles*, 169 F.3d at 1332.

●**The domestic farmworkers worked on Davis' premises.**   The sixth factor set out in the Department of Labor's regulation considers whether the work is performed on the premises of putative employer.  29 C.F.R. § 500.20(h)(5)(iv)(F).  This element reveals the worker's dependence on an entity because without the land, the employee might not have work.  In addition, the business owning the land will be likely to be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors.  *Antenor*, 88 F.3d at 936-37.   It is undisputed that the domestic farmworker plaintiffs worked on Davis' farm or at his packing shed.

●**Davis undertook responsibilities ordinarily performed by employers.**  The final factor identified by the Department of Labor regulations considers whether the putative employer undertakes responsibilities ordinarily performed by an employer, including preparing payroll records, issuing paychecks, providing workers' compensation insurance or providing field sanitation facilities or tools for use by the workers. 29 C.F.R. § 500.20(h)(5)(iv)(G).  When a putative employer voluntarily assumes responsibility for workplace obligations the law imposes

on employers, this indicates voluntary assumption of employer status for other purposes.

Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,736.   It was

Davis' admitted employee, Addly Pierre, who prepared most of the payroll records for

Bontemps' bean-picking crew and prepared the pay envelopes.  In addition, Davis provided all of

the field sanitation facilities.

 Each of the Department of Labor's regulatory factors indicates that Davis jointly

employed the domestic farmworker Plaintiffs.   His involvement with the members of Bontemps'

crew extended to virtually every facet of their employment.   No meaningful employment

decisions were left to Bontemps' sole discretion.  This was not a situation where the labor

contractor was able to exercise "absolute, unfettered, and sole control" over the workers and their

employment. *Aimable*, 20 F.3d at 440-41.

<u>**Defendants' violations of the AWPA**</u>

 The domestic farmworker Plaintiffs seek summary judgment for Davis' alleged violation

of five separate provisions of the AWPA.  Each of these violations will be discussed separately.

### A.  Disclosure violations

 The AWPA requires that agricultural employers provide migrant workers at the time of

their recruitment with a written statement of the proffered wages and job terms.  29 U.S.C. §

1821(a).[11]   Under the AWPA, Davis cannot escape his obligations merely because he chose to

hire through Bontemps as an intermediary.  H.R. Rep. 97-885, 97th Cong. 2d Sess., at 14,

*reprinted at* 1982 U.S. Code Cong. & Adm. News 4560; *Saintida v. Tyre*, 783 F. Supp. 1368,

---

[11]Even though some of the Plaintiffs traveled to Davis' farm on their own in search of
work, Davis was nonetheless obligated to provide the written disclosures.  *Contreras v. Mt.
Adams Orchard Corp.*, 744 F. Supp. 1007 (E.D. Wash. 1990) ("recruitment" means "to hire").

1373 (S.D. Fla. 1992)*; Aviles v. Kunkle*, 765 F. Supp. 358, 366, n.9 (S.D. Tex. 1991).

Bontemps acknowledged that the neither the Plaintiffs nor the other crew members were ever provided with such written disclosures.

### B.  Recordkeeping violations

The AWPA imposes specific recordkeeping obligations upon agricultural employers. Among other things, agricultural employers are required to record accurately the number of hours worked by each employee, maintain permanent addresses of all workers and list all withholdings from wages and the purpose for each withholding.   29 U.S.C. § 1821(d)(1) and 29 C.F.R. § 500.80(a).   Accurate payroll records are essential in order to determine whether workers have been paid the FLSA minimum wage.  *Fields v. Luther*, 1988 WL 59963 at * 12 (D. Md. May 4, 1988); *Bertrand v. Jorden*, 672 F. Supp. 1417, 1425 (M.D. Fla. 1987).

Davis relied on Bontemps to maintain records on the members of his crew.   Bontemps failed badly in these recordkeeping duties, many of which were delegated to Addly Pierre, a Davis employee.   No records were kept as to the time the crew spent harvesting peas or beans paid on a piece-rate basis.  *Osias v. Marc*, 700 F. Supp. 842, 844 (D. Md. 1988) (payroll records must accurately reflect the hours worked by each employee); *see also Contreras v. Mt. Adams Orchard Corp.,* 744 F. Supp. 1007, 1008 (E.D. Wash. 1990).   The records also listed the production of several workers under a single picker's name on the records.  *Osias*, 700 F. Supp. at 844 (the AWPA requires that each worker's production and earnings be listed separately). Finally, these records were not retained by either Davis or Bontemps, despite the AWPA's requirements.  29 U.S.C. § 1821(d)(1) (requiring records to be maintained for three years).

### C.  Wage statement violations

The AWPA, 29 U.S.C. § 1821(d)(2), requires that agricultural employers provide migrant

workers each pay period with wage statements containing certain data regarding hours worked, wages earned and withholdings from wages.  These wage statements permit workers to verify the correctness of their pay and to raise any concerns with the employer regarding the wages and how these wages were calculated.  In addition, these wage statements provide workers with a permanent record of their employment for purposes such as filing tax returns and applying for unemployment compensation benefits.  *Saintida*, 783 F. Supp. at 1372; *Frenel v. The Freezeland Orchard Co.*, 1987 WL 46894, at *3 (E.D.Va. Dec. 24, 1987).

The only wage statements provided to the domestic farmworker Plaintiffs were the envelopes in which their cash wages were enclosed.   The envelopes did not include the hours worked or piece-rate units earned, nor did they show the hours worked on piece-rate tasks or the employer's name and address.

### D.  Wage payment violations

The AWPA mandates that agricultural employers pay farmworkers their wages promptly when due.  29 U.S.C. § 1822(a).    In interpreting this provision, courts have this provision also requires employers to timely report the worker's earnings to the Social Security Administration and to file appropriate W-2 forms.  *Elizondo v. Podgorniak,* 70 F. Supp. 2d 758, 777 (E.D. Mich. 1999); *Saintida*, 783 F. Supp. at 1372.

The Defendants acknowledge that no Social Security taxes were paid on the wages of Bontemps' crew for the four-year period covered by this litigation, nor were their wages from work on the Davis farm reported to the Social Security Administration so that the workers' individual earnings records could be credited with this work.

### E.  Housing violations

The AWPA requires that prior to occupancy, any person who owns or controls housing

used to accommodate migrant workers must have the facility inspected and approved by an appropriate health authority.   29 U.S.C. § 1823(b)(1).[12]   Persons are considered to control migrant housing if they manage, supervise or administer the facility, and are responsible for making repairs to the facility.   *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1328 (11th Cir. 2008).

During the time they worked for Davis, the Plaintiffs resided in mobile homes Davis rented from his father.   Davis was responsible for maintaining and repairing the mobile homes, and thereby was obligated to ensure that the facilities were inspected and permitted before the migrant workers moved into the trailers.   Prior to 2011, no health authority had ever inspected or permitted these facilities for occupancy by migrant workers.

### Intentionality of Davis' AWPA violations

In order for farmworkers to recover damages under the AWPA, the violations must be "intentional." 29 U.S.C. § 1854(c)(1).  Specific intent to violate the law is not required; rather, the Act employs the common civil standard which holds one liable for the natural and foreseeable consequences of one's acts.  *Cochran v. Vann*, 963 F.2d 384, 1992 WL 103977 (11th Cir. 1992) (unpublished decision); *Saintida,* 783 F. Supp. at 1374; *Wales v. Jack M. Berry Groves, Inc.*, 192 F. Supp. 2d 1292, 1303 (M.D. Fla. 2000); *Campbell v. Miller*, 836 F. Supp. 827, 830 (M.D. Fla. 1993).  In cases where violations occur as a part of a defendant's normal business practices, no further showing of intent is required.  *Stewart v. Everett*, 804 F. Supp. 1494, 1498 (M.D. Fla. 1992); *Osias*, 700 F. Supp. at 844.

---

[12]The AWPA's housing provisions apply to "persons" who furnish housing to migrant workers, regardless of whether they are agricultural employers under the Act.  29 U.S.C. § 1823; *Howard v. Malcolm*, 629 F. Supp. 952, 953-54 (E.D.N.C. 1986).

This Court finds that Davis' violations of the AWPA were intentional.  The violations were not isolated oversights but resulted from Davis' standard operating procedures over four consecutive harvest seasons.

### Damages to be awarded for AWPA violations

The AWPA provides that aggrieved farmworkers who bring civil actions may be awarded their actual damages or up to $500 in statutory damages for each violation of the AWPA.  29 U.S.C. § 1854(c)(1).  Separate damage awards for each season are appropriate in this case because each harvest constitutes a distinct and separate transaction.  *Leach v. Johnston*, 812 F. Supp. 1198, 1211 (M.D. Fla. 1992); *Rivera v. Adams Packing Ass'n, Inc.*, 707 F.2d 1278, 1283 (11th Cir. 1983); *Bertrand* 672 F. Supp. at 1426.

The purpose of statutory damages is two-fold.  First, they serve to compensate injured farmworkers, especially in those instances where damages are inherently difficult to measure.  *Leach*, 812 F. Supp. at 1211.  Second, statutory damages are designed to promote enforcement of the Act and to deter violations, both by the defendant and other agricultural employers.  *Martinez v. Shinn*, 992 F.2d 997, 999 (9th Cir. 1993); *Leach*, 812 F. Supp. at 1211;  *Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 631 (W.D. Tex. 1999) ("[T]he primary purpose of the Act's statutory awards provisions is promoting compliance by agricultural employers").   To this end, damage awards should be large enough so it is not cheaper to violate the Act and be sued than to comply with the AWPA's requirements.  *Castillo*, 96 F. Supp. 2d at 631; *Bertrand*, 672 F. Supp. at  1425.  Furthermore, the legislative history of the Act notes that farmworkers who attempt to assert their rights must overcome a general background of fear and intimidation caused by the widespread practice of retaliation against those who complain about violations.  Accordingly, awards should be adequate to encourage farmworkers to assert their statutory

rights. *Castillo*, 96 F. Supp. 2d at 631; *Bertrand*, 672 F. Supp. at 1425.

In assessing statutory damages in a manner so as to effectuate the deterrent, as well as the compensatory, purposes behind the Act's civil remedy, courts have considered a number of factors. *Wales*, 192 F. Supp. 2d at 1309. Under the circumstances of this case, these factors merit the award of the maximum $500 in statutory damages for each of Davis' violations of the AWPA, or $2500 per harvest season per Plaintiff:

●**Total amount of the award.** The domestic farmworker Plaintiffs were subjected to five substantive violations of the AWPA (disclosure, recordkeeping, wage statement, wage payment and housing provisions) during each harvest season. The total statutory damages awarded are $112,500 ($2500 for each of the total of 45 harvest seasons worked by the 29 domestic farmworker Plaintiffs). This amount is neither oppressive nor unreasonable, given the violations involved and their persistence over time. Any lesser award would offer little incentive for Davis and other farm operators to comply with the AWPA's requirements. Indeed, a modest award would likely make it cheaper to violate the Act and be sued than to comply with its dictates, given the potential savings Davis can realize by keeping no payroll records, paying no employment taxes and using unpermitted housing to accommodate his harvest workers. *See, e.g., Alzalde v. Ocanas*, 580 F. Supp. 1394, 1396 (D. Colo. 1984) ($227,500 in statutory damages awarded in default judgment against farm labor contractor in action brought by 65 farmworkers under the corresponding provisions of the AWPA's predecessor statute).

●**Nature and persistence of the violations.** These violations were not merely technical; they directly affected the income and well-being of the workers. Courts have repeatedly concluded that the sort of recordkeeping violations present in this case were substantive, rather than technical, in nature. *See Martinez*, 992 F.2d at 1000; *Washington v.*

30

*Miller*, 721 F.2d 797, 803 (11th Cir. 1983); *Saintida*, 783 F. Supp. at 1375; *Leach*, 812 F. Supp. at 1211.[13]  Similarly, courts have viewed the failure to provide complete and accurate wage statements as a serious, substantive violation of the AWPA.  *Saintida*, 783 F. Supp. at 1375. Davis' failure to pay any Social Security taxes will impact the Plaintiffs and the other migrant workers for years to come.

Particularly telling is the persistence of these violations over time.  This Court has found no reported decision under the AWPA in which a grower's violations of farmworkers' fundamental rights under the AWPA have persisted for as many years as have been shown in this case.[14]

Despite this litigation and repeated investigations by federal and state officials, Davis still refuses to keep payroll records, pay Social Security taxes or to obtain operating permits for his labor camp.  Only a sizeable monetary damages award will impress on Davis the importance of compliance with the AWPA's requirements.

●**Extent of the defendant's culpability.**   For purposes of AWPA damages, a party is culpable if the violations were clearly avoidable by the defendant.  *Leach*, 812 F. Supp. at 1211. In this case, these violations occurred as a direct result of Davis' decision to ignore Bontemps'

---

[13]Among other things, accurate payroll records are needed in order to determine whether workers have received the minimum wage.  *See Bertrand*, 672 F. Supp. at 1425 ("The importance of accurate payroll records is obvious in instances, such as here, where workers' earnings often fall below the minimum wage established by federal law.  Only through accurate payroll records of the number of hours worked can the minimum wage obligations be calculated with precision.")   Because Davis kept no payroll records whatsoever, it is impossible to determine with any precision the unpaid minimum wages due the workers or to correct their Social Security earnings records to include their wages for work on Davis' farm.

[14]The closest analog found in this regard is *Leach*, where the grower violated many of the same provisions of the AWPA as Davis for three consecutive harvest seasons.  *Leach*, 812 F. Supp. at 1212.

slipshod recordkeeping practices and failure to pay Social Security taxes on the workers' wages.[15]   Davis chose to continue house workers at his unpermitted labor camp, thereby savings the cost of bringing the facilities up to state and federal standards.   These AWPA violations were not mere oversights on Davis' part, but instead were actions regularly and deliberately undertaken, and serving to substantially reduce his operating costs.   Despite being repeatedly reminded of his obligations by investigators from the United States Department of Labor and through this litigation, Davis stubbornly refused to comply with the law, perhaps in an effort to retain the financial benefits he realized by ignoring its dictates.  *Leach*, 812 F. Supp. at 1211 (defendant's culpability supports maximum award of statutory damages where "violations did not result from ignorance and misconceptions as to the state of the law, but rather from an abusive disregard for the Plaintiffs' rights.")

●**Damage awards in similar cases**.  Courts have generally awarded substantial statutory damages for the violations of the AWPA at issue here.  Furthermore, there has been substantial inflation since the AWPA was enacted in 1982, reducing the deterrent value of the maximum statutory award.  *See Castillo*, 96 F. Supp. 2d at 631, n.64 ("Today, a $500 damage award may be necessary to achieve the same level of deterrence as $300 in 1983.").  *See also Herrera v. Singh*, 103 F. Supp. 2d 1244, 1249 (E.D. Wash. 2000).

Many courts have awarded the full $500 in statutory damages for the violations at issue in this case:

> <u>Disclosures</u> (29 U.S.C. § 1821(a)) - *Leach*; *Herrera*: *Ortiz v. Paramo*, 2009 WL 4575618 (D.N.J. 2009); *Bertrand*.

---

[15]This is not altogether surprising, because Davis does not pay Social Security taxes on his own employees, except for bookkeeper Pat Seguin.

**Recordkeeping** (29 U.S.C. § 1821(d)(1)) - *Washington v. Miller*, 721 F.2d 979 (11th Cir. 1983); *Bertrand; Herrera; Leach.*

**Wage statements** (29 U.S.C. § 1821(d)(2)) - *Leach; Avila v. A. Sam & Sons*, 856 F. Supp. 763 (W.D.N.Y. 1994).

**Payment of wages when due** (29 U.S.C. § 1822(a)) – *Lainez v. Baltazar*, 2013 WL 3288369, at *2 (June 28, 2013); *Martinez*; *Ortiz.*

**Housing** (29 U.S.C. § 1823(b)(1)) – *Lainez*; *Herrera.*

●**Defendant's ability to prevent future violations of the Act.**   Davis continues to farm and still relies on Bontemps to furnish him harvest labor.   As a result, he "has the ability to prevent future violations simply by complying with the requirements of the AWPA." *Stewart*, 804 F. Supp. at 1499.  Without a sizeable damages award, Davis will have little incentive to take the steps to comply with the Act's requirements in the future.

●**Substantive nature of the violations.**   The violations in this case were unquestionably substantive in nature.  Indeed, these sorts of violations have previously been described by the Eleventh Circuit as "not mere technicalities but serious violations which denied Plaintiffs the substantive protections of the [Act]." *Washington*, 721 at 803.   These were not merely minor violations; they directly impacted the lives of the Plaintiffs.

●**The circumstances of the case.**   Davis realized considerable savings in his labor costs by failing to keep payroll records.  This concealed potentially widespread minimum wage violations and spared him thousands of dollars in Social Security taxes.  A sizeable award of statutory damages is appropriate so that it is not cheaper for Davis and other farmers to ignore the AWPA's provisions and be sued rather than to comply with the Act's requirements. *Castillo*, 96 F. Supp. 2d at 631; *Bertrand*, 672 F. Supp. at 1425.

- 33 -

●**The total number of plaintiffs involved.**   There are 29 domestic farmworker Plaintiffs in this action.  As a result, even if the full amount of statutory damages requested is awarded, Davis' liability under the AWPA is $112,500, a modest amount given the pervasive violations over the years. Furthermore, these workers represent a small fraction of the farmworkers subjected to these unlawful practices over these four harvest seasons, making an award of this size appropriate.

●**The total number of violations.**   Davis violated several of the most important substantive provisions of the AWPA, evidencing a blatant disregard for the Act's requirements. The domestic farmworker Plaintiffs have chosen to forego claims relating to other apparent violations of the AWPA in order to concentrate on these particularly egregious infractions.[16]

Given the gravity of the violations, this Court finds that an award of $112,500 is appropriate in this case.

●**Recovery on closely related claims.**     The only relief the farmworkers will receive is under the AWPA. Unlike the class members in *Wales*, Plaintiffs here have not recovered on any other related claims.   This is probably due in part because of Davis' wholesale failure to keep payroll records, which would have permitted this Court to determine the amount of additional minimum wages, if any, due Plaintiffs and to ensure their earnings for harvesting Davis' crops were reported to the Social Security Administration.

This Court expressly determines that there is no reason for delay and expressly directs the entry of judgment as set out in this order.  *See* Fed. R. Civ. P. 54(4). This is particularly true

---

[16]Among other things, Bontemps never bothered to register as a farm labor contractor and the workers were driven to the fields by Addly Pierre, who admittedly did not have a valid driver's license.

- 34 -

where, as here, counsel has indicated Plaintiffs are likely to abandon the balance of their claims.

In any event, unless and until Plaintiffs voluntarily dismiss the balance of their claims, the case

will go forward on all remaining claims.  Moreover, Plaintiffs may apply for an award of costs in

light of this judgment.

For these reasons,

**IT IS ORDERED**

The Domestic Farmworker Plaintiffs' Motion for Partial Summary Judgment, ECF No.

131, is **GRANTED**.   The Clerk shall enter judgment for the Plaintiffs against Defendants,

Steven M. Davis and Steven Davis Farms, LLC, jointly and severally, in the total amount of

**$112,500.00**.   Further, each Plaintiff shall be awarded $500.00 in statutory damages for each of

the five (5) AWPA violations per harvest, for a total of $2,500.00 for each harvest season

worked.  The amounts due individual Plaintiffs for their respective seasons worked are as follow:

| Farmworker Plaintiff | Seasons Worked | AWPA Stat. Damages |
|---|---|---|
| Yves Augustin | 2008 | 2,500.00 |
| Francillon Badio | 2009 | 2,500.00 |
| Marie Marthe Beneche | 2009 | 2,500.00 |
| Juslaine Cherelus | 2007, 2008, 2009, 2010 | 10,000.00 |
| Dalestin Cherenfant | 2007, 2008, 2009, 2010 | 10,000.00 |
| Sifort Contreker | 2007, 2008, 2009 | 7,500.00 |
| Pierre Anes Darvilmar | 2007, 2008 | 5,000.00 |
| Marie I. Desruisseau | 2007, 2008, 2009 | 7,500.00 |
| St. Gelus Dufresne | 2007, 2008 | 5,000.00 |
| Marie Yolene Exume | 2009 | 2,500.00 |

| | | |
|---|---|---|
| Delinoir Fanette | 2008, 2009 | 5,000.00 |
| Marie Almonor Faustin | 2007, 2008, 2009, 2010 | 10,000.00 |
| Devilma Florvil | 2007, 2008, 2009, 2010 | 10,000.00 |
| Andre Jean-Baptiste | 2009, 2010 | 5,000.00 |
| Zillianne Joly | 2007, 2008 | 5,000.00 |
| Merancia Joseph | 2007, 2008 | 5,000.00 |
| Rosie Joseph | 2007, 2010 | 5,000.00 |
| Anite Labrousse | 2007, 2008, 2009 | 7,500.00 |
| Clervis Louis | 2009 | 2,500.00 |
| Edel Joseph Mayard | 2009 | 2,500.00 |
| Andrelise Mezilus | 2008, 2009 | 5,000.00 |
| Decion Nelson | 2007, 2008, 2009 | 7,500.00 |
| Addly Petitfrere | 2007, 2010 | 5,000.00 |
| Inocio Andre Simeon | 2007, 2008 | 5,000.00 |
| Pierre Stimable | 2007, 2008, 2009, 2010 | 10,000.00 |
| Iclercia St. Juste | 2009 | 2,500.00 |
| Mimose Vincent | 2009, 2010 | 5,000.00 |
| Epfanie Saintelus Vital | 2007, 2008 | 5,000.00 |
| Dukens Zephir | 2007, 2008, 2009, 2010 | 10,000.00 |
| Total Amount for AWPA Violations: | | **$112,500.00** |

**SO ORDERED on July 1, 2014.**

                                         **s/Mark E. Walker**
                                         **United States District Judge**

**ADDENDUM**

| Domestic farmworker plaintiff | Harvest season(s) worked | AWPA statutory damages |
|---|---|---|
| Yves Augustin | 2008 | $2500 |
| Francillon Badio | 2009 | $2500 |
| Marie Marthe Beneche | 2009 | $2500 |
| Juslaine Cherelus | 2007, 2008, 2009, 2010 | $10,000 |
| Dalestin Cherenfant | 2007, 2008, 2009, 2010 | $10,000 |
| Sifort Contreker | 2007, 2008, 2009 | $7500 |
| Pierre Anes Darvilmar | 2007, 2008 | $5000 |
| Marie I. Desruisseau | 2007, 2008, 2009 | $7500 |
| St. Gelus Dufresne | 2007, 2008 | $5000 |
| Marie Yolene Exume | 2009 | $2500 |
| Delinoir Fanette | 2008, 2009 | $5000 |
| Marie Almonor Faustin | 2007, 2008, 2009, 2010 | $10,000 |
| Devilma Florvil | 2007, 2008, 2009, 2010 | $10,000 |
| Andre Jean-Baptiste | 2009, 2010 | $5000 |
| Zillianne Joly | 2007, 2008 | $5000 |
| Merancia Joseph | 2007, 2008 | $5000 |
| Rosie Joseph | 2007, 2010 | $5000 |
| Anite Labrousse | 2007, 2008, 2009 | $7500 |
| Clervis Louis | 2009 | $2500 |
| Edel Joseph Mayard | 2009 | $2500 |
| Andrelise Mezilus | 2008, 2009 | $5000 |
| Decion Nelson | 2007, 2008, 2009 | $7500 |
| Addly Petitfrere | 2007, 2010 | $5000 |

| Inocio Andre Simeon | 2007, 2008 | $5000 |
|---|---|---|
| Pierre Stimable | 2007, 2008, 2009, 2010 | $10,000 |
| Iclercia St. Juste | 2009 | $2500 |
| Mimose Vincent | 2009, 2010 | $5000 |
| Epfanie Saintelus Vital | 2007, 2008 | $5000 |
| Dukens Zephir | 2007, 2008, 2009, 2010 | $10,000 |

*